Evan Livingstone, SBN 252008
Attorney at Law
740 4th St, Ste 215
Santa Rosa, CA 95404
Phone (707) 206-6570
Fax     (707) 676-9112
Email: evanlivingtone@sbcglobal.net

Attorney for Debtor/Defendant

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In Re: | ) | Case No. 09-12585 |
| | ) | |
| Ryan Neuman and Sheri Neuman | ) | Chapter 7 |
| | ) | |
| Debtor(s) | ) | AP No. 10−01107 |
| ———————————————— | ) | |
| | ) | PLAINTIFF'S MOTION FOR |
| Marie Pardi, Thomas and Carrie Samuela-Pierucci, Farid and Jennifer Zeinal, and Louis Pierucci | ) | SUMMARY JUDGMENT (FRCP 56); DECLARATION OF RYAN NEUMAN |
| | ) | |
| Plaintiff(s) | ) | Hearing |
| | ) | |
| Ryan Neuman and Sheri Neuman | ) | Date: May 6, 2011 |
| | ) | Time: 10:00 AM |
| Defendant(s) | ) | Place: Santa Rosa, CA |
| ———————————————— | ) | |

Ryan Neuman and Sheri Neuman, Defendant and Movant herein, hereby submits this Motion to the Court for an order for summary judgment in the above-captioned adversary proceeding pursuant to Federal Rule of Civil Procedure 56 because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

This Motion is based on the attached Memorandum of Points and Authorities, the Declaration of Ryan Neuman filed concurrently herewith, and such other papers and pleadings

1   and arguments of counsel as may be presented to the Court at or before the hearing on the

2   motion.

3

4   Dated: March 26, 2011

    _____
    Evan Livingstone
5                                   Attorney for Defendant
    Ryan Neuman and Sheri Neuman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.

INTRODUCTION

Ryan Neuman and Sheri Neuman, Defendant and Movant herein, hereby submits this Motion to the Court for an order for summary judgment in the above-captioned adversary proceeding pursuant to Federal Rule of Civil Procedure 56 because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Plaintiffs' Complaint objecting to the discharge of Defendant's alleged to Plaintiffs is based on two allegations: "Obtaining Money by Fraud (11 USC 523(a)(2)(A)" and "Defalcation and/or Embezzlement While Acting in a Fiduciary Capacity (11 USC 523(a)(4))".

Since the evidence submitted in with the attached declaration of Defendant Ryan Neuman is not controverted by the Plaintiffs, there exists no genuine dispute as to material fact. Furthermore the undisputed facts demonstrate that the court has no grounds for demonstrating that the alleged debts plaintiffs should not be discharged in Defendant Debtor's bankruptcy under either 11 U.S.C. §§ 523(a)(2) or 523(a)(4).

II.

FACTS

In 2006 debtor/defendant Ryan Neuman, a real estate developer, conceived a plan to build a housing development project on some underutilized land on Guerneville Road in Santa Rosa. The project, named Forsythe Subdivision was to be developed by Ryan Neuman's company Cornerstone Homes & Development. The builder was McGuillicudy Constructions and various subcontractors and consultants were employed in completing the project.

To finance development, permitting, construction and sales of the project Ryan Neuman, along with the plaintiffs, entered into an agreement to form Black Oak Investment Partners LLC,

1  a limited liability corporation in which they were all members, and Ryan Neuman was general

2  manager for the purpose of managing the project.

3          The original investment by the members in the corporation was $800,000. All of this

4  money was invested in the Forsythe Subdivision project. $286,500 was invested in down

5  payments on the 1740 Guerneville Road properties. $125,000 was paid by the Neumans out of

6  contract prior to closing – this money was reimbursed to the Neumans. An additional down-

7  payment of $161,500 was then paid for the 1740 Guerneville Rd property in the purchase

8  contract, making the total down payment for 1740 Guerneville Rd to be $286,500.

9          The down payment paid for the 1810 Guerneville Rd property was $325,623. The total

10  amount of investor funds remaining after the down payments were paid was $189,876. An

11  additional $56,262 in funds was made available for the project as a result of a re-finance Ryan

12  Neuman arranged for the 1740 Guerneville Rd property in February 2007. Also, approximately

13  $24,000 in rent was received from renting the house on the 1740 Guerneville Rd property. All of

14  these funds were spent on developing the project, caring for the properties and servicing the

15  loans on the property, including such costs as paying permit fees, obtain noise impact mitigation

16  reports, on geotechnical investigations, on tree preservation mitigation reports environmental site

17  assessment, an architect tentative map and site design, on property survey and on engineering

18  maps. Although defendant project general manager Ryan Neuman was not required to invest any

19  of the Neuman's own money in the project, the Neumans used more than $20,000 of their own

20  funds trying to keep the project afloat. This was in addition to the hundreds of hours defendant

21  worked on the project without charge in his capacity as project manager, work for which he was

22  contractually entitled to charge the corporation but for which he never did.

23  //

24  //

## THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL FACT AND

## THE MOVANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

A. There Was No Obtaining Money by Fraud under 11 USC 523 (a)(2)(A)

It is generally recognized that in order for a creditor to have a debt declared non-dischargeable pursuant to § 523(a)(2)(A)  it must satisfy by "clear and convincing evidence" that:  1—the debtor made the representations; 2—at the time he knew they were false; 3—he made them with the intention and purpose of deceiving the creditor; 4—the creditor relied on such representations; and 5—the creditor sustained the alleged loss and damage as the proximate result of the representations. *In re Hultquist*, 101 B.R. 180, 185 (9th Cir. B.A.P. 1989)

See also *In re Slyman*, 234 F.3d 1081 (9th Cir. 2000) "The five elements, each of which the creditor must prove by a preponderance of the evidence, are:  (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct."

In the present case all of the five of fraud elements are not present.

1. There was no representation the Plaintiff's investment in Black Oak Investment Partners LLC was an investment without considerable risk.

The Investor Qualifications and Representations document that is part of Exhibit A specifically warns: "The undersigned understands and acknowledges that an investment in a Membership Interest in the Company involves a high degree of risk and that there is no assurance of any profit or return on the investment and that the investment could lose money. The undersigned understands that any projections which may be made by the Company or the

1    Manager may be based on assumptions which may or may not be accurate, and that if any

2    assumptions are not accurate, the actual results will be different; and that neither the Company

3    nor the Manager has guaranteed or otherwise promised that any particular success or result will

4    actually be obtained."

5         2. Since there were no representations as to the success of the corporation, there was no

6    way defendant could have known the statements he didn't make were false. In addition there is

7    no way that defendant would have known of the impending downturn in the real estate market

8    when he proposed the development project in 2006.

9         3. There is no evidence that Defendant made any misrepresentation with the intent of

10   deceiving the plaintiffs. Defendant's intention was to make money on the project also. If he did

11   not intend to make money on the project he would never have used the investment money to buy

12   the two properties on which the project was to be located.

13        4. The plaintiffs did not rely on Defendant's representations. The Investor Qualifications

14   and Representations document that is part of Exhibit A states: "The undersigned is capable of

15   bearing the economic risk of this investment, and personally and/or because of independent

16   representatives and business advisors, has such knowledge and experience in financial and

17   business matters that he or she is capable of evaluating the merits and risks of an investment in

18   the Membership Interests and has the capacity to protect his or her own interests.

19        5. Defendants acts were not the proximate cause of the loss of plaintiffs' investment. The

20   proximate cause of the loss of plaintiffs' investment was the decline in the value of the real estate

21   market.

22        Because all of the elements of fraud are not present the court should grant summary

23   judgment to the defendant on the claim of Obtaining Money by Fraud under 11 USC 523 (a)(2).

24

B. <u>There was no Defalcation and/or Embezzlement While Acting in a Fiduciary Capacity under 11 USC 523(a)(4)</u>

As an officer of a California corporation defendant owed plaintiff no fiduciary duty with respect to the assets of the corporation, unless the corporation was insolvent at the time of the alleged defalcation, which it was not.

Defendant's role as managing member of the Black Oak LLC did not create the fiduciary relationship that creates an exception to discharge under 11 U.S.C. §523(a)(4).

The court in *In re Cantrell, 329 F.3d 1119* (9th Cir. 2003) said a corporate officer is not a fiduciary under § 523(a)(4).

The Cantrell court approved California law decision in Bainbridge v. Stoner, 16 Cal.2d 423, 106 P.2d 423 (1940), where the California Supreme Court held:

"One who is a director of a corporation acts in a fiduciary capacity, and the law does not allow him to secure any personal advantage as against the corporation or its stockholders. However, strictly speaking, the relationship is not one of trust, but of agency...." Id. at 426 (citations omitted); see also *Bancroft-Whitney Co. v. Glen*, 64 Cal.2d 327, 49 Cal.Rptr. 825, 411 P.2d 921, 934 (1966) (stating that while officers and directors stand in a fiduciary relation to the corporation, they are "technically not trustees").

"Therefore, under Bainbridge, although officers and directors are imbued with the fiduciary duties of an agent and certain duties of a trustee, they are not trustees with respect to corporate assets."

The Bankruptcy Appellate Panel of the Ninth Circuit decision in *In re Jacks*, 266 B.R. 728 (9th Cir. B.A.P. 2001) stated that a fiduciary duty owed by officers and directors of an insolvent corporation under California law was actionable under 523(a)(4), but only if the corporation was insolvent at the time of the defalcation.

1    However in the present case, is no allegation that defendant defalcated funds after the

2    Corporation was insolvent. As the Corporation approached insolvency defendant called a

3    meeting of all the members of the Corporation and explained to them that all of the money they

4    invested in the Corporation had been spent on acquiring the properties, developing the project

5    and paying the notes on the mortgages on the property. Defendant advised the plaintiff members

6    that there was no more money to move forward on development of the project or to pay the

7    mortgages. Defendant also advised the members that because of the decline in value in the real

8    estate market it would not be possible to sell the units for the amount of money they are possible

9    when they invested money in 2005.

10    Defendant advised members they would have to contribute more money to save the project

11    and see it through to completion, and advised them that the project would fail if no more

12    contributions were made from members. After having been appraised of the situation and what

13    would happen to the project, all of the members subsequently declined to invest further funds in

14    the corporation.

15    *In re Littleton*, 942  F.2d 551 (9th Cir. 1991) Under federal law, embezzlement in the

16    context of nondischargeability has often been defined as "the fraudulent appropriation of

17    property by a person to whom such property has been entrusted or into whose hands it has

18    lawfully come." *Moore v. United States*, 160 U.S. 268, 269 (1885). Embezzlement, thus, requires

19    three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's

20    appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances

21    indicating fraud." *In re Hoffman*, 70 B.R. 155, 162 (Bankr.W.D.Ark.1986); *In re Schultz*, 46

22    B.R. 880, 889 (Bankr.D.Nev.1985).

23    The Black Oak Operating Agreement states that the only fiduciary duties a Manager

24    owes to the Company and the other Members are the duty of loyalty and the duty of care set

forth in subdivisions (a) and (b) below: (a) limited to the following: A Manager's duty of loyalty to the Company and the other Members is to account to the Company and hold as trustee for it any property, profit, or benefit derived by the Manager in the conduct or winding up of the Company's business or derived from a use by the Manager of Company property; A Manager's duty of care to the Company and the other Members in the conduct and winding up of the Company business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

The Black Oak Operating Agreement indemnifies Manager for acts within the scope of his duty. Paragraph 5.S. Indemnification of the Manager states "The Manager shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Manager within the scope of the authority conferred on them by this Agreement, and within the standard of care specified in Section 5.7.5."

C.  There was No Defalcation because Partners Money was Spent on Development Project

There was no defalcation because defendant spent all of the money the plaintiffs invested in the Black Oak Investment Partners LLC on the Black Oak Development Project. Debtor provides an accounting of the money spent on the project in his attached declaration.

"A defalcation within the meaning of § 523(a)(4) requires culpable conduct beyond mere negligence in failure to account." Bankruptcy Appellate Panel of the Ninth Circuit (161 B.R. 672 (1993) *In re Jack N. Martin* BAP No. EC-92-1005-RJP). The BAP defined defalcation thus:

> The term "defalcation" as used under § 523(a)(4) does not have a precise definition and no legislative history or comment exists to aid the interpretation.
>
> Corpus Juris Secundum has defined defalcation as "the failure of one who has received money in trust or in a fiduciary capacity to account and pay over as he ought...." 26A C.J.S. Defalcation, at 125-26 (1956). The primary difficulty is that definitions vary on whether defalcation includes some element of culpable conduct:

As used colloquially, and in criminal statutes, the word "defalcation" implies some moral dereliction, and as ordinarily understood the term implies some bad faith or misconduct, as distinguished from mere negligence or mistake; but in other contexts it is a broader term, and does not necessarily imply any dishonesty or fraud, or any criminal act.... However, to constitute a defalcation, there must have been mala fides. 26A C.J.S. Defalcation, at 125-26 (1956) (citations omitted).

Judge Learned Hand recognized the semantic difficulties concerning the definition: Colloquially perhaps the word, "defalcation," ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts. *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 511 (2d Cir.1937), aff'g *In re Herbst*, 2,2 F.Supp. 353 (S.D.N.Y.1937).

However, after *Central Hanover*, case law under the former Bankruptcy Act was not in agreement as to the scope of conduct constituting defalcation.

Although some courts have included innocent defaults in the definition of defalcation, in fact, there is generally some appearance of wrongdoing within the facts of each such case. See *In re Baird*, 11,4 B.R. 198 (9th Cir. BAP 1990); *In re Short*, 81,8 F.2d 693 (9th Cir.1987); *In re Gonzales*, 2,2 B.R. 58 (9th Cir. BAP 1982).

The purpose behind § 523(a)(4) favors the view that Congress intended that more than mere negligence be required for nondischargeability.

While negligence may be the standard for determining liability, some level of culpability is required for a debt to be nondischargeable under § 523(a)(4). Debts resulting from breaches of ordinary care are normally discharged in bankruptcy.

Only certain narrowly construed exceptions, displaying some level of culpability, are excepted from discharge by Congress in the text of § 523:

The purpose of the nondischargeability section in general was to remove from the debtor's capacity to discharge certain classes of debts arising from practices Congress deemed so pernicious that bankruptcy should not be able to insulate the debtor from their payment. *In re Hudson*, 85,9 F.2d 1418 (9th Cir. 1988).

It is well established that the limits on dischargeability of debts contained in § 523 should be construed narrowly so as to assure that the basic policy of giving the honest debtor a fresh start is not frustrated. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287,

289, 59 L.Ed. 717 (1915). Exceptions to discharge are to be construed strictly against creditors and in favor of the debtor's right to discharge. *In re Klapp*, 70,6 F.2d 998 (9th Cir.1983); *Gleason v. Thaw*, 236 U.S. at 562, 35 S.Ct. at 289. An exception to discharge impairs the debtor's fresh start and should not be read more broadly than necessary to effectuate policy, e.g. preventing debtors from avoiding debts incurred as a result of fraud or other culpable conduct. *In re Ellwanger*, 10,5 B.R. 551 (9th Cir. BAP 1989).

Given the diversity of definitions of "defalcation" discussed supra, it is not clear whether Congress intended the meaning in the culpable sense or the "mere failure to account" sense. Congress could have easily added language that a per se failure to account for assets is sufficient for nondischargeability, but no such language appears in, or can reasonably be implied from the text of § 523(a)(4).

We note that even cases holding that any failure to account, without more, constitutes a defalcation, contain facts which indicate some degree of culpability greater than mere negligence. For example, in *In re Short*, 81,8 F.2d 693 (9th Cir.1987), a partner used funds for personal living expenses. Both *In re Baird*, 11,4 B.R. at 204, and *In re Gonzales*, 2,2 B.R. at 59, involved facts where contractors diverted funds that were held in statutory trust for one subcontractor to other subcontractors. Similarly, almost all cases holding the debt nondischargeable had some bad faith present.

In addition, §§ 523(a)(2), (4) and (6) have one thing in common: they require some element of bad faith to render a debt nondischargeable. Because of the stigma that nondischargeability under these sections brings, the Code and the Rules require that complaints pursuant to these sections be filed within a brief period of time. Under § 523(a)(4) all the other grounds, i.e. fraud, embezzlement or larceny, require some element of bad faith. Therefore, to read "defalcation" as requiring only a breach of ordinary care would be inconsistent with the design of § 523 in general and, in particular, to the design of §§ 523(a)(2), (4) and (6).

We decline to expand the definition further and hold that the mere failure to use ordinary care in accounting for an asset does not per se constitute "defalcation" within the context of § 523(a)(4). There simply must be a showing of some element of bad faith or reprehensible conduct for nondischargeability under § 523(a)(4).

We must distinguish situations where a fiduciary had invested funds for a beneficiary and the resulting failure to account was due to a market diminution in the value of the

investment or failure to otherwise prudently invest those funds from the situation where the fiduciary was entrusted with funds but failed to produce any record of their disposition. The former is merely negligent, while the latter clearly involves wrongful conduct and would be considered a defalcation.

In the present case defendant has attached copies of real estate transactions and a cancelled check showing that the bulk of the monies invested was spent on making down payments on the two properties that were purchased as sites for the project. Furthermore it is uncontested that defendant serviced the loans on the properties for several years. Finally defendant has attached to his declaration evidence of costs incurred in development of the project, for example see Exhibit E, Black Oak Project Expenses.

Plaintiff on the other hand has presented no evidence of bad acts by defendant.

IV.

<u>CONCLUSION</u>

Based upon the foregoing, Defendant requests that the Court grant this Motion, make a ruling of summary judgment in favor of Defendant, and for such other relief as the Court deems just and proper.

Dated: March 26, 2011

_____
by:    Evan Livingstone
        Attorney for Ryan Neuman and Sheri Neuman

1  Evan Livingstone, SBN 252008
   Attorney at Law
2  740 4th St, Ste 215
   Santa Rosa, CA 95404
3  Phone (707) 206-6570
   Fax    (707) 676-9112
4  Email: evanlivingtone@sbcglobal.net

5  Attorney for Debtor/Defendant

6

7

8                UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10  In Re:                              )  Case No. 09-12585
                                        )
11      Ryan Neuman and Sheri Neuman    )  Chapter 7
                                        )
12          Debtor(s)                   )  AP No. 10−01107
    _____ )
13                                      )  PROPOSED ORDER ON
                                        )  PLAINTIFF'S MOTION FOR
14  Marie Pardi, Thomas and Carrie Samuela- )  SUMMARY JUDGMENT (FRCP 56);
    Pierucci, Farid and Jennifer Zeinal, and )  DECLARATION OF RYAN
15  Louis Pierucci                      )  NEUMAN
                                        )
16          Plaintiff(s)                )
                                        )  Hearing
17  Ryan Neuman and Sheri Neuman        )
                                        )  Date: May 6, 2011
18          Defendant(s)                )  Time: 10:00 AM
    _____ )  Place: Santa Rosa, CA

19      Having considered Defendants Ryan Neuman and Sheri Neuman motion for Summary

20  Judgment, the evidence presented to the court and the arguments made at the above hearing, the

21  court orders:

22      Defendants' summary judgment motion is granted and judgment for fees and costs is

23  entered in favor of Defendants.

24                        ** END OF ORDER **

CERTIFICATE OF SERVICE

I certify that I served the following person by first class mail with a copy of Plaintiff's

Motion for Summary Judgment and Declaration of Ryan Neuman with attachments:

Andrew Kern
755 Baywood Drive, 2nd Fl.
Petaluma, CA 94954

Dated: March 26, 2011

*Evan Livingstone*

Evan Livingstone

Evan Livingstone, SBN 252008
Attorney at Law
740 4th St, Ste 215
Santa Rosa, CA 95404
Phone (707) 206-6570
Fax     (707) 676-9112
Email: evanlivingstone@sbcglobal.net

Attorneys for Debtor(s)/Defendant(s)

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In Re: | ) | Case No. 09-12585 |
| | ) | |
| Ryan Neuman and Sheri Neuman | ) | Chapter 7 |
| | ) | |
| Debtor(s) | ) | AP No. 10−01107 |
| _____ | ) | |
| | ) | DECLARATION OF RYAN |
| Marie Pardi, Thomas and Carrie Samuela-Pierucci, Farid and Jennifer Zeinal, and Louis Pierucci | ) | NEUMAN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| | ) | |
| Plaintiff(s) | ) | Hearing |
| | ) | |
| Ryan Neuman and Sheri Neuman | ) | Date: May 6, 2011 |
| | ) | Time: 10:00 AM |
| Defendant(s) | ) | Place: Santa Rosa, CA |
| _____ | ) | |

I Ryan Neuman declare under penalty of perjury that the following document is a truthful

summary of the events and costs of the Black Oak Project.

In addition I swear that the documents filed as attachments to this declaration are true

copies of the documents they purport to be.

Dated: March 26, 2011                    /s/Ryan Neuman_____
                                                          Ryan Neuman

## Forsythe Subdivision

Black Oak Investment Partners LLC.

Project Name: Forsythe Subdivision

Developer: Cornerstone Homes & Development (Ryan Neuman)

Builder : McGuillicudy Constructions : David McGuillicuddy - Contractor

Subdivision Location 1740 & 1810 Guerneville Road Santa Rosa Ca 95403

## Reports and Studies – Can be provided if requested

1. Noise Impacts and Mitigations Report – Prepared by Sound Solutions
2. Design Level Geotechnical Investigations – Prepared by PJC & Associates
3. Tree Preservation and Mitigation Report – Prepared by Horticultural Associates
4. Phase 1 Environmental Site Assessment – Edd Clark & Associates, Inc.
5. Architect Tentative Map and Site Design – Ivan M. Lukrich Architect
6. Property Survey and Subdivision Map – Dimensions 4 Engineering
7. Project Site Engineering Map          - Dimensions 4 Engineering

## Consultants

1. Developer – Ryan Neuman
2. Contractor Builder – David McGuillicuddy
3. Planner – Jean Kapolchok & Associates
4. Architect – Ivan Lukrich
5. Civil Engineer – Bob Murphy
6. Surveyor – Bob Murphy
7. Sound Specialist – T.A. Barneby, Ph.D
8. Phase 1 – Edd Clark
9. Geotechnical – Pat Conway
10. Hoticultural Specialist – John Meserve
11. Well Consultant – Bartley Pump
12. Attorney – Randy Kenworthy (LLC Council)

## General Time Line of Development

### January through June of 2006

Initial evaluation of properties exploring development of the two parcels into a Subdivision.  Studied surrounding properties for sale and developments within 5 miles scheduled to be developed in the following years.  Exploring the financial requirements of the prospective development.

Met with Patrick McGee and he offered to provide personal funds in the amount of $300,000 and to raise the balance of necessary investor funds.  Patrick provided the marketing piece to his family members and ultimately brought them in on the investment opportunity.  Patrick McGee is a licensed real estate agent.  Patrick is a real estate developer who at the time had multiple project going.

Ryan Neuman spoke with Farid Zeinal an old personal friend and invited him in on the investment at which time he and his wife Jennifer decided to invest in the development project.  Farid and Jennifer are both licensed realtors where Farid works in the lending environment and Jennifer is an active realtor.

Marie Pardi is an associate of Patrick McGee.  Marie and Patrick worked together at Real Estate Risk Management where Marie was the Vice President of the company.  Patrick had met with and gained her interest in the development and acted as the go between for the investment.

Thomas and Carrie Pierruci are Patrick McGee and Tina McGee's relatives. Thomas Pierucci is the brother to Tina McGee.  Thomas and Carrie Pierucci were introduced to the project by Patrick McGee and ultimately he acted as the go between and brought in there funds into the project.

Louis Pierucci is the father of Tina McGee and father in law to Patrick.  Patrick and Tina had financial difficulties in 2007 and 2008.  Patrick lost most of their real estate holdings and developments in 2007 and 2008 leading to a personal bankruptcy in 2008.  During the financial difficult times of 2007 Patrick and Tina requested from the Partnership their investment interest be transferred to their father Louis Pierucci.  The transfer was granted in 2007.  Louis Pierucci was not an original investor and had no contact with the project prior to him taking possession of his daughter and son in laws interest in the LLC.

**June 2006**

1740 and 1810 Guerneville Road Santa Rosa Ca 95403 Purchased for purposes of developing a major subdivision of 15 homes.

**July 18th and August 2nd 2006**

Pre-Application Neighborhood Meeting held with City Officials August 2nd 2006 after July 18th mailing to all neighboring property owners and interested parties invited to attend a neighborhood meeting that had been scheduled for the 2nd of August to introduce the project.

**June 2006 through winter of 2007**

Ryan Neuman works with consultants to develop a subdivision for submittal to the City of Santa Rosa for developing the two parcels into 15 single family residence homes.

**January 2007**

A letter was written to the investor notifying them of the developments progress to date.

**January 26th 2007**

Civil Engineer Bob Murphy of Dimensions 4 Engineering was informed by City of Santa Rosa that project would require SUSUMP requirements due to total area coverage of impervious surface adding significant costs to project.

**January 29th 2007**

Disclosure Form provided to City of Santa Rosa Department of Community Development listing Black Oak Investment Partners LLC.

**February 23rd 2007**

Subdivision Tentative Map Application submitted to the Dept. of Community Development with the City of Santa Rosa.

**Reports, Studies and Subdivision Maps provided at time of Submittal**

- **Noise Impacts and Mitigations Report**
  - Prepared by Sound Solutions

- **Design Level Geotechnical Investigations**
  - Prepared by PJC & Associates

- **Tree Preservation and Mitigation Report**
  - Prepared by Horticultural Associates

- **Phase 1 Environmental Site Assessment**
  - Edd Clark & Associates, Inc.

- **Architect Subdivision Map and Site Design**
  - Ivan M. Lukrich Architect

- **Property Survey and Subdivision Map**
  - Dimensions 4 Engineering

- **Project Site Engineering Map**
  - Dimensions 4 Engineering

## April 2nd 2007

Black Oak Investment Partners LLC receives confirmation and File Number MJP07-009 From the Department of Community Development at the city of Santa Rosa the application has been determined that it has sufficient information to begin the project review phase.

## April 3rd 2007

Notice of Application sent by City of Santa Rosa to Neighboring Property Owners and Interested Parties.

## May 8th 2007

City of Santa Rosa Application Review Team (ART) Meeting to discuss the subdivision with new public Roadway. Applicant Black Oak Investment Partnership LLC.

## April 6th through May 29th

Department of Community Development completion of preliminary review of application based on plans date stamped Feb 28th 2007.  The following recommendation letter were generated and received.  Final Issues Letter generated by the city of May 29th, 2007.

April 6th – North Bay Corporation – Trash Company Conditions

April 13th – Santa Rosa Fire Department – Fire Department Conditions

April 13th – Santa Rosa Building Department – Building Division referral comments

April 17th – Santa Rosa Recreation and Parks Department – Conditions Comments

May 2nd – Pacific Gas & Electric (PG&E) – Public Utility Comments

May 15th – City of Santa Rosa Engineering Division – Memorandum

May 22nd – City of Santa Rosa Utilities Department – Memorandum

May 29th – City of Santa Rosa Planning Department – Tiger Salamander Clearance

May 29th – City of Santa Rosa Department of Community Development (Planning Dept)

1. Issues Letter Contained:
2. Project Design Comments
3. Planning Division
4. Building Division
5. Engineering Division
6. Utilities
7. Fire
8. PG&E
9. Parks & Recreation
10. North Bay (Garbage/Recycling)

**June 2007 through Spring 2008**

Evaluating Forsythe Subdivision outstanding issues provided by the city of Santa Rosa during the application process.  Significant amount of time and effort working with the team of consultants to satisfy the cities development issues.  I Discovered a significant change in City

engineering departments evaluation of Storm Drain. The City has indicated that they are requiring the subdivision to not connect up with existing storm drains on Guerneville Road and connect with Marlow road but rather to travel East on Guernville Road and connect up with a storm drain over a .5 mile away to the east. This change in direction from the city will drive up construction infrastructure costs by over $750,000. Due to a volatile market which had seen the beginning of the Credit Crisis affect lenders nationwide this impact had significant repercussions on the viability of the project.

### Fall of 2007 – Patrick McGee Transfer of Ownership to Louis Pierucci

Louis Pierucci is the father of Tina McGee and father in law to Patrick. Patrick and Tina had financial difficulties in 2007 and 2008. Patrick lost most of their real estate holdings and developments in 2007 and 2008 leading to a personal bankruptcy in 2008. During the financial difficult times of 2007 Patrick and Tina requested from the Partnership their investment interest be transferred to their father Louis Pierucci. The transfer was granted in 2007. Louis Pierucci was not an original investor and had no contact with the project prior to him taking possession of his daughter and son in laws interest in the LLC.

### August 2007 through Fall of 2008

After exhaustive discussions with consultants and engineers we were able to locate a an easement that the city has across a neighbor's property on parcel to the east of 1688 Guerneville Road ( The Redmon's Parcel) It was discussed if I could negotiate an easement with the Redmons across their parcel I would connect up to the storm drain in the subdivision directly behind Forsythe saving the $750,000 expense to dig up Guerneville Road.

I contacted the Redmon's whom I had previously spoken with in 2006 about acquiring their project to further increase the size and profitability of the Forsythe subdivision. The Redmons were very interested as they wanted to retire and move out of state. The Redmons had concerns and that included the easement location across their property while they still lived on the property. The City of Santa Rosa engineer Fred Browne had agreed to allow a temporary easement location along their property perimeter to satisfy the Redmon's concerns. We had agreed in principle but there were many financial and emotional concerns that the Redmon's had that had to be overcome.

With the continual decline of the housing market is Sonoma County the Redmons were concerned and wanted Ryan Neuman to acquire the property at 1688 Guerneville Road. They were commanding to high of a price and we continued to negotiate on the easement which would ultimately benefit the sale of their property.

## Summer of 2008

Ryan Neuman met with the investors of the Black Oak Investment Partners LLC, to inform them that the market had collapsed and that Ryan Neuman could not continue to pay for the interest carrying costs on the project and that the viability for a build out was not promising. The investors were apprehensive and reluctant to continue to invest into a project that looked like a total loss. In July of 2008 the investors decided to invest additional funds into the project. Unfortunately very few of the investors ever sent any funds and ultimately Ryan Neuman could no longer continue to pay the expenses of the project.

## January 2007 through 2010

Sonoma County Home prices have declined dramatically.

Sonoma County posted the sharpest decline in the Nine Bay Area Counties, plummeting 21.9 percent to $410,000 in 2009 from December 2006. As reported by Data quick.

| Sonoma County (Single Family Homes) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Prices | | Other | | | Percent Change | | |
| Date | Average | Median | Sold | DOM | SP/LP | Average | Median | Sold |
| 1998 | $256,576 | $218,950 | 6,125 | 56 | 98.1% | | | |
| 1999 | $294,547 | $244,000 | 6,298 | 54 | 98.1% | 14.8% | 11.4% | 2.8% |
| 2000 | $366,220 | $305,000 | 5,838 | 42 | 99.1% | 24.3% | 25.0% | -7.3% |
| 2001 | $422,824 | $348,000 | 4,657 | 68 | 97.6% | 15.5% | 14.1% | -20.2% |
| 2002 | $434,191 | $375,000 | 6,150 | 70 | 98.2% | 2.7% | 7.8% | 32.1% |
| 2003 | $486,498 | $420,000 | 6,063 | 67 | 98.4% | 12.0% | 12.0% | -1.4% |
| 2004 | $571,652 | $499,000 | 5,921 | 62 | 99.2% | 17.5% | 18.8% | -2.3% |
| 2005 | $674,388 | $591,000 | 5,923 | 57 | 99.2% | 18.0% | 18.4% | 0.0% |
| 2006 | $673,785 | $580,000 | 4,444 | 87 | 97.8% | -0.1% | -1.9% | -25.0% |
| 2007 | $656,258 | $550,000 | 3,364 | 105 | 96.9% | -2.6% | -5.2% | -24.3% |
| 2008 | $486,889 | $387,500 | 4,209 | 102 | 96.4% | -25.8% | -29.5% | 25.1% |
| 2009 | $414,585 | $340,000 | 4,585 | 102 | 97.1% | -14 | | |

July 2010 Housing Prices have continued to skid with an amazingly low Santa Rosa Median Home price falling to $325,000.

The Forsythe subdivision homes were originally scheduled to sell for $600,000. Due to unfavorable market conditions and a dramatic decline in home values the Forsythe Subdivision was not financially feasible to construct.

Project Expenses Through 2010

**Acquisition Costs**

**1740 Guerneville Road**                                                   $  900,000.00

**1810 Guerneville Road**                                                   $   900,000.00

**Initial Acquisition Cost**                                                **$1,800,000.00**

---

|                                                      | **Credits**      | **Expenses**        |
|------------------------------------------------------|------------------|---------------------|
| **<u>Investor Funds of $800,000</u>**                | **<u>$800,000.00</u>** |               |

**1740 Guerneville Road Initial Loans**

     1st lien $581,250

     2$^{nd}$lien $  38,750

**Down Payment Through Escrow**                                             $ 161,500.00

(Loan Fees, Insurance , Interest ,Title & Escrow)

Paid Out of Contract 5/17/2006 (see Cashier's Check                        $ 125,000.00

**<u>1740 Guerneville Road Down Payments Total</u>**                       **<u>($ 286,500.00)</u>**


**<u>1810 Guerneville Road Initial Loan</u>**

     1st Lien $585,000

(Loan Fees, interest, title & escrow) $10,623.81


**<u>1810 Guerneville Road Down Payment Total</u>**                        **<u>($ 325,623.81)</u>**

**Appraisal reimbursement to Ryan Neuman**                                 $      2,000.00


**<u>1740 and 1810 Guerneville Road Down Payment Total</u>**               **<u>$  610,123.80</u>**

**FUNDS REMAINING FROM INVESTORS AFTER DOWN**              $  189,876.20

**Refinance of 1740 Guerneville February 2007**

Lowered monthly payment paid taxes and interest payment

Leaving additional lien of credit available of $50,535.26

And cash at close of $5,726.99 for **$56,262.50**              $    56,262.25


**1740 Rental Property Income**              $    24,000.00

Property in extreme distress, never intended to have

Long term tenants. Significant problem with

Tenants and significant vacancy in property.


**Total Funds Available to Project**              **$270,138.45**

**Project Entitlement expenses for development**

**Civil Engineering, Property Survey, Tentative Subdivision Map Development**

**Architect**

**Environmental Consultant**

**Sound Consultants**

**Planning Consultant**

**Land Design Group**

| | |
|---|---|
| **Total Expenses** | **$58,337.92** |
| **City of Santa Rosa Subdivision Map Expenses** | **$22,730.50** |
| **Legal Fees for Development** | **$ 3,258.00** |
| **Franchise Tax Board Fees** | **$ 2,689.09** |
| **Property Maintenance** | **$ 5,352.41** |

　　　　**Well, Septic, Roof, Painting, Trash Removal, Fence, Pool Pump, Etc.**

| | |
|---|---|
| **Property Insurance (1740 & 1810)** | **$ 2,352.25** |
| **Property Weed (Annual High Grass)** | **$ 1.725.00** |
| **Printing Expenses – Subdivision Maps, etc.** | **$ 1,935.00** |
| **1740 Guerneville Road Property Management Fee** | **$ 2,400.00** |
| **Misc Expenses** | |
| 　　　**Banking Fees** | **$    108.32** |
| 　　　**Economy Key** | **$    135.09** |
| 　　　**Utilities (1740 Guerneville)** | **$     17.33** |
| **Loan Extension Fees North Coast Bank(1810 Guerneville 2006 & 2007)** | **$  5,850.00** |
| **Mortgage Expense (1740 & 1810 Guerneville)** | **$186,999.92** |

**<u>Total project expenses</u>**                                                    **<u>$293,890.83</u>**

**Project cash remaining after expenses on Project**                 **<u>($23,752.38)</u>**

**Neuman Contribution in Cash**                                          **<u>$ 23,752.38</u>**

- **Additional expenses that can be charged to the LLC**
    **Accounting and Tax Return Filing  $5,000**
    **5% of development expenses to the manager $5,000**
    **Loan refinance expenses, could have charged up to $20,000**